**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SONJA HILL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 7092 |
| | ) | |
| v. | ) | Judge Jorge Alonso |
| | ) | |
| CAROLYN A. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff appeals defendant's denial of her application for Disability Insurance Benefits and Supplemental Security Income ("benefits"). For the reasons set forth below, the Court affirms the Commissioner's decision and terminates this case.

**Medical History**

Plaintiff went to the emergency room ("ER") on March 14, and August 24, 1997 with asthma attacks. (Administrative Record ("AR") 630, 649.) Each time she was released with prescriptions for asthma medication.

On September 22, 2008, plaintiff went to the ER with an asthma attack. (AR 600.) She was given an Albuterol nebulizer and released with prescriptions for Prednisone, an Albuterol inhaler, and an antibiotic. (AR 601-03).

On February 5, 2010, plaintiff went to the ER, complaining of chest pain, shortness of breath, and cold symptoms. (AR 564-68.) She was released with a prescription for an antibiotic. (AR 571.)

In August 2010, plaintiff was admitted to the hospital for one day with complaints of chest

pain and left arm numbness. (AR 302.) Plaintiff told hospital staff that "she used to be on 'a bunch of medications' a few years ago, but she moved and did not follow up with her primary doctor and never refilled her medications." (AR 302.) The doctor assessed her as having "[m]oderate persistent asthma," "put [her] back on her Advair and albuterol inhalers which she has been on before, [and] told to continue with these." (AR 302.)

On November 4, 2010, Dr. Rohail, who became plaintiff's primary care physician, admitted plaintiff to the hospital for one day for an asthma attack. (AR 274-75.) She was given intravenous steroids and released with prescriptions for asthma medication. (AR 275.)

On January 9, 2011, Dr. Rohail admitted plaintiff to the hospital for one day because of shortness of breath. (AR 419.) A chest x-ray showed that her "lungs [were] clear." (AR 428.) She was counseled about smoking cessation and discharged. (AR 427.)

On February 19, 2011, at defendant's request, plaintiff had a consultative examination by Dr. Simon, who reported the history of her illness as follows:

> [Plaintiff] stated that she was diagnosed with asthma six years ago . . . . [and it] has [gotten] worse over time. She had four hospital admissions over the past six months. She stated that she usually had one to two admissions in a year. She woke up two to three times a night and seven nights in a week because of shortness of breath. She uses her nebulizer at home three times a day and is compliant with her medications. She stated that she uses her albuterol approximately five times a day every day. She avoids going outside because of shortness of breath. She stated that she is able to walk approximately a block then she has to stop and use her medications because of shortness of breath. She is able to climb one flight of stairs and then has shortness of breath; she has to live on the first floor because she avoids climbing stairs. The last time she saw pulmonologist was one year ago.

(AR 344, 347.) Under the heading "Activities of Daily Living," the doctor wrote:

> She can walk one and half block then has shortness of breath. She can stand for approximately an hour then she feels tired. She can sit, but she was tired. She is able to lift less than 10 pounds, but avoids doing so. She can climb one flight of stairs and has shortness of breath. She is unable to vacuum a normal size room

2

because of shortness of breath. She is able to bathe and dress herself. She does not drive.

(AR 344.) With respect to plaintiff's lungs, the doctor found that plaintiff had "[d]iffuse wheezing and . . . a cough with deep inspiration. No rales[1] or rhonchi."[2] (AR 345.) The pulmonary function tests showed that medication improved plaintiff's pulmonary function. (*See* AR 350-58.)

On April 22, 2011, a medical consultant, Dr. Panepinto, reviewed plaintiff's medical records and completed a physical residual functional capacity ("RFC") for her, which concludes that plaintiff can occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand/walk and sit for six hours of an eight-hour work day, occasionally climb stairs, ladders or scaffolds, and should avoid concentrated exposure to extreme cold or heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (AR 360-63.) The basis given for the RFC is:

> PE [consultative physical examination] 2/19/11 indicates . . . visibly short of breath with minimal exertion, lungs had diffuse wheezing and cough with deep inspiration with no rales or rhonchi, normal gait, all joint were [sic] normal no CCE, the rest of the exam was within normal limits.

(AR 360.) In August 2011, another medical consultant, Dr. Kenney, agreed with Dr. Panepinto's assessment. (AR 385-87.)

On May 4, 2011, Plaintiff saw Dr. Rohail to refill her inhaler. (AR 372.) He found that her "[l]ungs [were] clear, no rales, no rhonchi, no wheezes." (AR 372.)

---

[1] "Rales" are "abnormal sound[s] heard accompanying the normal respiratory sounds on auscultation of the chest." *See* http://www.merriam-webster.com/dictionary/rales. "Auscultation" is "the act of listening, either directly or through a stethoscope or other instrument, to sounds within the body as a method of diagnosis." *See* http://dictionary.reference.com/browse/auscultation.

[2] "Rhonchi" are "whistling or snoring sound[s] heard on auscultation of the chest when the air channels are partly obstructed." *See id.* Rhonchus.

3

On June 1, 2011, plaintiff saw Dr. Rohail for right knee effusion[3] and had an MRI of the knee that showed she had a "[m]oderate amount of joint effusion," and "[c]hondromalacia patella."[4] (AR 374, 378) Dr. Rohail also noted that: (1) she was "in no acute distress"; (2) her "[l]ungs [were] clear, no rales, no rhonchi, no wheezes"; and (3) her claim for disability had been denied. (AR 374.)

The same day, Dr. Rohail completed an RFC for plaintiff. In it, he stated that plaintiff has asthma attacks every two months and each attack incapacitates her for a week. (AR 389.) He said that she can only walk a block without needing rest, can stand/walk for less than two hours of an eight-hour work day, can never crouch, climb ladders, or lift, and should avoid concentrated exposure to extreme heat or cold, high humidity, smoke, fumes, odors, and gases. (AR 390-91.) On June 6, 2011, Plaintiff again saw Dr. Rohail, whose notes state that she "now feels better" and "[k]nee effusion resolved[,] legs and knee looks [sic] totally normal now." (AR 375.)

On September 6, 2011, plaintiff went to see Dr. Rohail because she "ran out of Advair inhaler and [is] now SOB [short of breath], very." (AR 498.)

On October 4, 2011, plaintiff again saw Dr. Rohail for knee pain. (AR 500.) He gave her a cortisone injection, which gave her immediate relief, and told her to use a cane and take Ibuprofen. (AR 500.)

On October 18, 2011, plaintiff told Dr. Rohail that the knee pain had returned. (AR 501.) He noted that she had full range of motion and was able to walk on the knee, but prescribed Norco for pain, told her to continue taking Ibuprofen, and referred her to a specialist. (AR 501.)

---

[3] Knee effusion is "excess fluid accumulation in or around [the] knee joint." *See* http://www.mayoclinic.org/diseases-conditions/water-on-the-knee/basics/definition/con-2002607.

[4] "Chondromalacia patella" is "damage to the cartilage under [the] kneecap." *See* http://www.mayoclinic.org/diseases-conditions/chondromalacia-patella/basics/definition/con-20025960.

On November 9, 2011, plaintiff saw a knee specialist, Dr. Smith, who noted that she "ambulates full weight bearing – with cane – left cane in car today." (AR 493.) He said her right knee had "mild" effusion and chondromalacia, prescribed a non-steroidal anti-inflammatory drug, and referred her to physical therapy. (AR 493-95.)

On November 29, 2011, plaintiff saw Dr. Rohail and reported that she had had an asthma attack at home. (AR 502.) He directed her to take oral steroids in addition to the inhaled medication she was already using. (AR 502.)

On March 13, 2012, plaintiff saw Dr. Rohail, complaining that her "asthma [was] acting up" and her "knee pain [was] bad." (AR 504.) However, Rohail observed that she was able to "walk in and out of the exam room swiftly," and said that her "[l]ungs [were] clear, no rales, no rhonchi, no wheezes." (AR 504.)

On May 8, 2012, Dr. Rohail completed another RFC for plaintiff. He reported that she had severe asthma with frequent exacerbation and "severe disabling chondromalacia of the left knee." (AR 703.) He said she had asthma attacks once a month that incapacitated her for "6-7 days." (AR 703.) He said she could "barely walk," could sit for forty-five minutes, stand for fifteen minutes, could not stoop, crouch or lift anything, and had to avoid all exposure to extreme heat or cold, high humidity, fumes, odors, dusts, and gases. (AR 704-05.)

**Procedural History**

On November 5, 2010, plaintiff filed an application for benefits alleging a disability onset date of April 1, 2007. (AR 10.) She reported that she had asthma, which caused her to stop working as a mail carrier for the U.S. Postal Service, which she had done from February 1998 to April 1, 2006. (AR 182, 192.) She also stated that her condition made her unable to walk for more than twenty minutes, lift more than fifteen pounds or stay outside for a long period of time. (AR 200, 205.)

The Commissioner denied her application both upon initial review and upon reconsideration. (AR 70-78, 87-93.) Thereafter, plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on June 7, 2012. (*See* AR 28-69.) On July 11, 2012, the ALJ denied plaintiff's application for benefits. (*See* AR 10-20.) On July 13, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (AR 1.) This appeal followed.

## **Discussion**

The Court reviews the ALJ's decision *de novo* but gives deference to her factual findings. *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006). The decision will be upheld if it is supported by substantial evidence, *i.e.*, evidence "sufficient for a reasonable person to conclude that [it] supports the decision." *Id.* at 735 (quotation omitted). The Court is "not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "In fact, even if reasonable minds could differ concerning whether [plaintiff] is disabled, we must nevertheless affirm the ALJ's

decision denying her claims if the decision is adequately supported." *Id.* (quotations and citations omitted).

Plaintiff first contends that the ALJ erroneously failed to give controlling weight to the opinions of plaintiff's treating physician, Dr. Rohail. The regulations require an ALJ to give a treating physician's opinion on the nature and severity of the claimant's impairments controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Otherwise, the ALJ considers a variety of factors in determining the weight to give to a medical opinion. *See* 20 C.F.R. § 404.1527(c)(1)-(6).

The ALJ did not give controlling weight to Dr. Rohail's pulmonary RFC because his opinions "[were] not supported by his own treatment notes or other medical evidence of record," (AR 18), a conclusion plaintiff says the record refutes. The record shows that Dr. Rohail first treated plaintiff for asthma on November 2, 2010, and admitted her to the hospital on November 4, 2010 for an asthma attack. (*See* AR 377, 274-75.) In January 2011, he again admitted plaintiff to the hospital for shortness of breath, but a chest x-ray showed that her lungs were clear, and the only treatment she received was smoking cessation counseling. (AR 419-28.) On May 4, 2011, plaintiff saw Dr. Rohail to refill her inhaler, and he found that her "[l]ungs [were] clear, no rales, no rhonchi, no wheezes." (AR 372.) Yet a month later, Dr. Rohail completed the first RFC, which says plaintiff has asthma attacks every two months, can only walk a block without needing rest, and cannot stand/walk for two hours. (AR 389-91.)

Dr. Rohail did not see plaintiff again for asthma until the fall of 2011, in September because she had run out of Advair and in November, and on both occasions he found her lungs to be clear,

without rales, rhonchi, or wheezes. (AR 498, 502.) On March 13, 2012, plaintiff told Dr. Rohail, that her "asthma [was] acting up," but again he found that her lungs were clear, without rales, rhonchi, or wheezes. (AR 504.) On May 8, 2012, Dr. Rohail completed a second RFC for plaintiff, which states that she has asthma attacks that incapacitate her for 6-7 days, and as a result, would be absent from any job more than four times a month. (AR 703-05.) Given the variation between Dr. Rohail's records and the two RFCs he completed for plaintiff, the ALJ's rejection of his opinions as not supported by his treatment notes is not erroneous.

The ALJ's conclusion that Dr. Rohail's opinions are not supported by the other treaters' evidence is equally sound. The record shows that plaintiff was treated for asthma attacks by doctors other than Rohail twice in 2007, once in 2008, and twice in 2010. (AR 302, 564-71, 600-03, 630, 649.) Moreover, in August 2010, she told ER staff that she had been on medication "a few years ago, but . . . moved and . . . never refilled [them]." (AR 302.) Given that her attacks occurred so infrequently and she went without medication for "a few years," there is no error in the ALJ's finding that other medical evidence contradicts Dr. Rohail's opinions.

With respect to plaintiff's knee condition, Dr. Rohail's May 8, 2012 RFC states that she has "severe disabling chondromalacia & DJD [degenerative joint disease] of the left knee," can "barely walk," can sit for forty-five minutes and stand for fifteen, and cannot stoop, crouch, or lift anything. (AR 703-05.) His treatment notes, however, show that he only saw plaintiff four times – on September 6, October 4, and 18, 2011, and March 13, 2012 – for knee pain, gave her Ibuprofen, a cortisone shot, and pain medication, which plaintiff did not take because it was "to [sic] strong." (AR 493, 499-501, 504.) Moreover, on October 18, 2011, Dr. Rohail said that plaintiff had full range of motion in her knee and was able to walk on it, and on March 13, 2012, he said that she was

8

"able to walk in and out of the exam room swiftly." (AR 493, 501, 504.) Thus, the ALJ did not err in concluding that Dr. Rohail's notes with respect to plaintiff's knee do not support his RFC.

Even if the ALJ's failure to give Dr. Rohail's opinions controlling weight was not erroneous, plaintiff contends that her evaluation of them still violated the regulations. According to the regulations, when a treating physician's opinion is not given controlling weight, the ALJ considers: (1) whether the doctor examined the claimant; (2) the length of the treater's relationship with the patient and the frequency of examinations; (3) the nature and extent of the treatment provided; (4) the extent to which the opinion is supported by medical evidence; (5) the extent to which the opinion is consistent with the record as a whole; (6) whether the doctor is opining on issues in which he/she specializes; and (7) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6). The ALJ ascribed "little weight" to Dr. Rohail's RFC because it was inconsistent with his own notes, the records of other treating and non-treating physicians, it was contradicted by objective medical evidence of plaintiff's pulmonary function and the x-rays and MRI of plaintiff's knee, and because Dr. Rohail saw plaintiff only sporadically and treated her conditions conservatively. (*See* AR 15-18; *see id.* 17 (crediting the opinions of the two consulting physicians, Drs. Panepinto and Kenney, because "they are experts in disability evaluation, their opinions are consistent with the minimal treatment of record, lack of objective findings[,] . . . normal pulmonary function testing," and the MRI and x-rays of plaintiff's right knee).) That analysis is sufficient to support the ALJ's conclusion. *See Henke v. Astrue*, 498 Fed. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every [20 C.F.R. § 404.1527(c)] factor while discussing her decision to reject [the treater's] reports, but she did note the lack of medical evidence

9

supporting [his] opinion and its inconsistency with the rest of the record. This is enough.") (citations omitted).

Plaintiff also attacks the ALJ's RFC determination, which is that plaintiff can:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can lift and/or carry twenty pounds occasionally and ten pounds frequently. She can stand and/or walk for at least six hours in an eight-hour workday and can sit with normal breaks for about six hours in an eight-hour workday. She can push and pull without limitation. She can occasionally climb ramps and stairs but never ladders, ropes or scaffolds. She can have occasional exposure to extreme cold, extreme heat, fumes, odors, gases, poor ventilation, and other pulmonary irritants.

(AR 13.) This conclusion is faulty, plaintiff contends, because the ALJ did not correlate the record evidence to each function in the RFC. However, the Seventh Circuit has said that such an exercise is unnecessary:

> Knox argues that the ALJ erred by failing to perform a function-by-function analysis of his ability to perform daily living and work-related activities. He asserts that social security rulings require a function-by-function assessment. Although the RFC assessment is a function-by-function assessment, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient. The ALJ satisfied the discussion requirements by analyzing the objective medical evidence, Knox's testimony (and credibility), and other evidence. . . . The ALJ need not provide a written evaluation of every piece of evidence, but need only minimally articulate his reasoning so as to connect the evidence to his conclusions. We find the ALJ's analysis proper.

*Knox v. Astrue*, 327 Fed. Appx. 652, 657-58 (7th Cir. 2009) (quotations and citations omitted). As in *Knox*, the ALJ in this case assessed the medical evidence as well as plaintiff's statements and testimony before determining the RFC. (*See* AR 14-18.) That is sufficient.

Plaintiff also faults the ALJ for failing to determine whether plaintiff needed a cane to walk. "This failure is important," plaintiff argues, "because the ALJ did not pose any hypothetical questions to the vocational expert that included the need for a cane." (Pl.'s Br. Supp. Reversing

10

Comm'r's Decision at 9.) The Court disagrees. The only reasonable inference from the ALJ's omission of a cane from the RFC is that she did not believe plaintiff needed to use one. The ALJ's failure to say so explicitly does not invalidate the RFC. *See Knox*, 327 Fed. Appx. 657-58; (AR at 16 (noting that plaintiff used a cane at the hearing and at one doctor's appointment, but did not use one at the consultative exam at which time she had "a normal gait and the ability to walk at least fifty feet unassisted").)

Next, plaintiff argues that the ALJ's RFC erroneously fails to account for the fact that plaintiff cannot talk for long periods of time. The Court disagrees. The ALJ explicitly credited the opinion of medical consultant Panepinto, who took plaintiff's speech limitation into account when formulating her RFC. (*See* AR 360-66 (setting forth RFC and stating that "clmnt's statements that she is no longer able to walk or lift or stay outside for long periods of time or she becomes sick, she is unable to talk for long periods of time because she gets SOB [shortness of breath] . . . is [sic] seen as mostly credible.").)

Lastly, plaintiff argues that the ALJ failed to follow the following regulation regarding credibility determinations:

> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.
>
> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

3. Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR-7p, 1996 WL 374186, at **1-2 (July 2, 1996). Specifically, plaintiff argues that the ALJ violated paragraph five by using "boilerplate" credibility language rather than making a specific credibility determination.

It is true that the ALJ recited boilerplate language regarding credibility, a practice that the Seventh Circuit has condemned. (*See* AR 15 (stating that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment")); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (characterizing similar language as "meaningless boilerplate").

That is not, however, the only part of the decision bearing on credibility. On the contrary, the ALJ described in great detail why she did not find plaintiff's "testimony regarding the severity or frequency of her symptoms to be fully credible":

> The claimant has a strong work history and appeared sincere at the hearing, but that does not overcome the lack of objective support for her disabling impairments. For both her asthma and knee problems, the claimant has received limited and conservative treatment. The claimant does not require strong pain medication for relief. She was taking Ibuprofen 400 milligrams, which she indicated did not help, but she did not take [Norco] because it was too strong. The claimant testified to only mild side effects from her medications, such as drowsiness and shakiness. The claimant's activities of daily living do not support a finding of disability as the claimant is able to care for her minor son, prepare meals, drive, and travel to Las Vegas in early 2010. The claimant has provided inconsistent information regarding daily activities. The claimant testified she no longer smokes cigarettes, but when she went to the doctor or [ER] she informed them that she smokes a half a pack of cigarettes daily. The claimant testified and reported that she has a driver's license and drives, but informed the consultative examiner that she does not drive. The record reflects significant gaps in the claimant's history of treatment. The claimant testified that she has not seen a pulmonologist in over two years and at the consultative examination in February 2011 the claimant indicated it had been at least one year since she was seen by a pulmonologist. The claimant's use of medication does not suggest the presence of an impairment(s) that is more limiting than found in this decision. At one point the claimant had not refilled her medications for years after she moved and has also ran [sic] out of Advair on another occasion. The claimant was using a cane at the hearing and at least at one of her doctor's appointments, but at the consultative examination she did not use a cane and had a normal gait with the ability to walk at least fifty feet unassisted.

(AR 18, 15.) (citations omitted). Given this detailed explanation, there is no reason for the Court to disturb the ALJ's credibility determination. *Elder*, 529 F.3d at 413 ("When assessing an ALJ's credibility determination, . . . . we merely examine whether the . . . determination was reasoned and supported.")

## **Conclusion**

For the reasons set forth above, the Court grants defendant's motion for summary judgment [18] and affirms her decision denying plaintiff's application for benefits. This case is terminated.

**SO ORDERED.**                                   **ENTERED: February 3, 2015**

                                                                    _____
                                                                    **HON. JORGE ALONSO**
                                                                    **United States District Judge**